**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------X**

| | |
|---|---|
| **In re:** | **Chapter 11 (Subchapter V)** |
| **SHRI RADHA KRISHNA MANDIR INC.,** | **Case No. 1-26-40076-jmm** |
| **Debtor.** | **Hon. Jil Mazer-Marino** |

**-----------------------------------------------------------X**

**SHRI RADHA KRISHNA MANDIR INC.,**

**Plaintiff,** **Adv. Pro. No. ___-_____**

**- against -**

**THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF FINANCE; and SHREE RADHA KRISHNA, LLC (nominal defendant),**

**Defendants.**
**-----------------------------------------------------------X**

## COMPLAINT FOR DETERMINATION OF TAX LIABILITY UNDER 11 U.S.C. § 505, DISALLOWANCE OF CLAIM UNDER 11 U.S.C. § 502, DECLARATORY AND INJUNCTIVE RELIEF, AND RELIEF UNDER RLUIPA, 42 U.S.C. § 1983, AND THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF NEW YORK

> This is "a religious corporation, one of a class of litigants that the Legislature has determined to be entitled to special safeguards." *Berlin v. New Hope Holiness Church of God, Inc.*, 93 A.D.2d 798, 799 (2d Dep't 1983).

Plaintiff Shri Radha Krishna Mandir Inc., debtor and debtor in possession (the "Temple," the "Mandir," or the "Debtor"), by its counsel, Dahiya Law Offices LLC, for its complaint against the City of New York (the "City"), the New York City Department of Finance ("DOF"), and, nominally, Shree Radha Krishna, LLC (the "LLC"), alleges:

## PRELIMINARY STATEMENT

1. This adversary proceeding asks a single question in several legal registers: may the City of New York tax a Hindu temple as if it were a commercial venture — imputing to a sanctuary the income of a business it has never operated, penalizing it for failing to file the income statements of a business it has never been, compounding the resulting arrears at eighteen percent, and marching the result toward a lien sale — when the City's own assessment roll has classified the building, for years and on every notice it mailed, as "M9: Miscellaneous Religious Facility"?

2. New York's answer has been settled for more than a century: real property owned by a religious corporation and used exclusively for religious purposes "shall be exempt" from taxation. RPTL § 420-a(1)(a). That exemption is not a legislative grace note; it is entrenched in the State Constitution itself, which shields it even from repeal. N.Y. Const. art. XVI, § 1. The Supreme Court of the United States has explained the principle underneath both: a State that exempts its houses of worship practices a "benevolent neutrality" that avoids the "excessive entanglement" between church and state which taxation — with its valuations, its examinations of religious finances, its liens, and ultimately its foreclosures — inevitably produces. *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669–70, 674–76 (1970). As *Walz* recognized — echoing Madison's Memorial and Remonstrance, whose premise that "religion is not within the cognizance of Civil Government" became the First Amendment — the power to tax a sanctuary carries with it the power to destroy one. And the deepest irony of this proceeding: *Walz* itself was a suit to compel the New York City Tax Commission to tax this City's houses of worship — and it was this City that resisted, defended its exemption of devotional property through every court, and prevailed. The City now inverts, against this temple, the very principle it carried to victory in the Supreme Court.

3. The only reason this temple has been taxed at all is a defect of paper, not of substance: since 2014, bare record title to the temple has been marooned in a shell — the LLC — created by the Temple's late priest and thereafter controlled by his widow, Nadira Sharma, who ran the Temple and the LLC as one operation, received the tax notices[1] at her own home — 105-48 132nd Street, South Richmond Hill, New York, the same address to which she had redirected the Temple corporation's official mail by causing the New York Department of State's records to be changed to designate herself as the Temple's registered agent for the receipt of process and notices, so that both entities' official mail arrived in one private mailbox, away from the temple itself at 126-04 133rd Avenue, South Ozone Park, where the congregation worshiped daily and would have seen it — never sought the exemption, never challenged a single assessment, and let the congregation's sanctuary slide toward the auction block twice over. The equitable and beneficial owner of the building — the entity whose congregation bought it in 1999, rebuilt it with

[1] The Debtor received only the final City tax-lien notice, delivered to the temple premises themselves. No foreclosure-related papers were ever received by the Debtor or its officers. It was a real estate broker — Trevor of Century 21, not any legal notice — who, in the summer of 2023, first apprised the Debtor's members that the temple property was scheduled for foreclosure auction on August 25, 2023.

bare hands and borrowed savings after the 2014 fire, and has worshiped in it every day since — has always been the Temple. This Court's companion proceedings will conform record title to that reality. This proceeding conforms the tax treatment to it.

4. The Temple seeks: a determination under 11 U.S.C. §§ 505 and 502(b)(1) that DOF's claim (Claim No. 1, $368,711.13) is unenforceable to the extent the Property was mandatorily exempt; disallowance or subordination of the confiscatory interest and penalty components of that claim; a declaration securing the exemption prospectively upon the vesting of record title in the Temple under its plan; redetermination of the arbitrary 2021 revaluation for all periods open under applicable law; relief under RLUIPA as to the land-use apparatus that misclassifies the temple; relief under 42 U.S.C. § 1983 for the as-applied violation of the First and Fourteenth Amendments; and a refund of the monies the congregation paid on account of taxes never lawfully owed.

## JURISDICTION, VENUE, AND PARTIES

5. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the Eastern District of New York. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O), including the allowance or disallowance of claims and the determination of tax liability under 11 U.S.C. § 505. To the extent any claim herein is non-core, Plaintiff consents to the entry of final orders and judgment by this Court. Fed. R. Bankr. P. 7008. This proceeding arises under Bankruptcy Rule 7001(1), (2), (7), and (9).

5-A. Standing. The Debtor sues on its own stake, not another's. Article III requires an injury in fact, fairly traceable to the defendant and redressable by decision, and each element appears on the face of this complaint: DOF has filed a $368,711.13 claim against this estate, redressable by disallowance under §§ 502 and 505; interest accrues at eighteen percent against property the estate claims; the Temple has already paid $40,000.00 from congregational funds, redressable by refund and recoupment; and the City's lien-sale machinery ran against the building this congregation occupies daily. Standing to object to a claim filed against one's own estate is conferred by § 502(a) itself — and the City, which demanded payment from the Debtor, contracted with the Debtor under the Debtor's own EIN (Installment Agreement No. 152611), and accepted the Debtor's $40,000, cannot be heard to deny the very interest it has been collecting against.

5-B. No prudential doctrine bars this suit. The Debtor does not assert the rights of Shree Radha Krishna, LLC; it asserts the estate's own equitable and beneficial ownership under 11 U.S.C. § 541(a) and (d), and the LLC is before the Court as a defendant, bound by any judgment. At the pleading stage the Debtor's ownership allegations must be accepted as true and construed in its favor, *Warth v. Seldin,* 422 U.S. 490, 501–02 (1975); an objection to standing that can succeed only by resolving record-title ownership against the pleader is a merits argument in threshold disguise. Nor is there any zone-of-interests difficulty: § 505 exists for estates disputing taxes; § 502(a) makes the debtor the paradigm objector to claims; RPTL § 420-a exists for religious corporations; and the Religion Clauses protect the very institution that sues. See *Bennett v. Spear,* 520 U.S. 154, 162–66 (1997) (zone-of-interests inquiry generously construed).

5-C. Nor may the ownership question be resolved on a jurisdictional motion. Where a contested jurisdictional fact overlaps with the merits — as the Temple's equitable ownership does here, being at once the predicate of standing and an element of Counts I through IV and IX — the ordinary facial/factual framework of a Rule 12(b)(1) challenge does not apply: "the District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits," *Land v. Dollar*, 330 U.S. 731, 739 (1947), and threshold dismissal is proper only if the claim is "wholly insubstantial and frivolous," *Bell v. Hood,* 327 U.S. 678, 682–83 (1946); accord *Shapiro v. McManus,* 577 U.S. 39, 45–46 (2015). A claim of equitable ownership that rests upon the City's own "M9 — Miscellaneous Religious Facility" classification, the City's own installment agreement executed with the Debtor under the Debtor's own EIN, and twenty-seven years of open, exclusive congregational worship is not insubstantial. Any challenge to it must accordingly be heard, if at all, on the merits — under Rule 12(b)(6), where this complaint's allegations control, or upon a full evidentiary record — and not through a standing objection that would decide the central disputed fact of the case at the courthouse door.

5-D. The standing analysis is fortified by the pattern, pleaded throughout this complaint, of overlapping and interchangeable operation: one congregation, one treasury, one building, administered under two names. The City billed the LLC and contracted with the Debtor — under the Debtor's own EIN — for the same tax account; the foreclosing lender pleaded the borrower as a "Religious Corporation" whose occupants reside at a "Religious Structure"; and a single stewardship collected the Temple's donations and applied them to the LLC's mortgage. In function, and in the understanding of every party that ever dealt with them, each entity was the

image of the other — the LLC a bare, title-holding reflection of the Temple whose instrumentality it was. Those facts supply standing in a further, independent sense: claims to disregard or to consolidate an instrumentality with the debtor are themselves property of the estate, which the debtor in possession alone may assert. See *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989). And the question will shortly be adjudicated on the merits: the Debtor is filing an adversary proceeding for the substantive consolidation of the LLC into this estate, nunc pro tunc, see *Union Sav. Bank v. Augie/Restivo Baking Co.,* 860 F.2d 515, 518 (2d Cir. 1988), upon which the LLC's nominal title and this estate will merge and even the formal premise of any standing objection disappears. Standing does not await that consolidation — the estate's own interest and injury are complete today — but its imminence confirms that the objection contests, at most, the sequence of adjudication rather than the Temple's entitlement to be heard.

6. Venue is proper under 28 U.S.C. § 1409. The Debtor's chapter 11 case, No. 1-26-40076-jmm, is pending in this district.

7. Plaintiff is a New York not-for-profit religious corporation organized on March 2, 1998 under § 402 of the Not-for-Profit Corporation Law, recognized by the Internal Revenue Service as a tax-exempt church, EIN 06-1516938. It operates the Hindu house of worship at 126-04 133rd Avenue, South Ozone Park, Queens, New York, Block 11785, Lot 32 (the "Property").

8. Defendant City of New York is a municipal corporation. Defendant DOF is the City's agency charged with assessment and collection of real property taxes; it filed Claim No. 1 in the Debtor's case asserting a secured claim of $368,711.13. Nominal defendant Shree Radha Krishna, LLC is a New York limited liability company holding bare record title to the Property; its sole member died on May 2, 2018, and, on information and belief, no successor member was ever lawfully admitted. The LLC is named so that the declarations sought herein bind all parties claiming an interest of record.

## FACTUAL BACKGROUND

### A. One Temple, One Congregation — and a Deed Left in the Wrong Hands

9. The Mandir was founded in 1997 by Jodha Persaud and Pandit Rabindranauth Sharma in a Queens garage, and incorporated in 1998. In 1999, with the pooled savings of working congregant families, the Property was purchased as the congregation's permanent house of

worship. The first floor became the sanctuary; the second hosted the congregation's religious functions — Hindu weddings, pujas, festivals, and the life-cycle ceremonies of devotee families — whose voluntary offerings helped carry the building. The second floor has never been let for secular or commercial purposes; its use, like the sanctuary's, has always been religious.

10. In 2014 a fire partially destroyed the building. For nearly three years the congregation worshiped in members' living rooms while rebuilding with its own money and labor — one congregant refinanced his home and gave $97,500. The rebuilt Mandir, with its ornamental cupolas, sanctuary floor, and community kitchen, reopened on May 27, 2017. It has been in the congregation's open, continuous, and exclusive religious use ever since.

11. During the rebuilding, in July 2014, the LLC was formed on paper with Pandit Sharma as its sole member, and on August 8, 2014 the Property was quitclaimed to the LLC for ten dollars, no transfer tax paid. Nothing was sold; nothing changed but paper. The LLC has never had an office, employees, income, operations, or a bank account known to the Debtor. Upon the death of its sole member on May 2, 2018, and absent any timely continuation under N.Y. LLC Law § 701(a)(4), the LLC was left without a living member — a name on a deed. The structure was disqualifying from its birth: an LLC may hold exempt religious property, if at all, only where its sole member is itself an exempt religious organization and its organizational documents confine it to the member's exempt purposes; this LLC had an *individual* as its sole member and an operating agreement authorizing it to own and operate real estate and engage in "any lawful act or activity" — the negation of every condition of exemption. That the temple's title was parked in such a vehicle is chargeable to those who built and exploited the structure, not to the congregation that never knew.

12. From May 2018 through August 2023, Nadira Sharma, the late priest's widow, operated the Temple and the LLC as a single enterprise: she collected the congregation's donations — soliciting them monthly as needed "to pay the mortgage and to pay the bills for the mandir" — applied portions to the LLC's mortgage, received both entities' mail at her own home at 105-48 132nd Street, South Richmond Hill — upon information and belief, having herself caused the Department of State's records for the Temple corporation to be changed to designate her, at that home address, as the registered agent to receive process and official notices, completing the seal on the congregation's ignorance — and held the Temple's corporate kit together with the

operation's books. And in her own formal filings she characterized the temple's title-holder as secular commercial real estate: in the foreclosure action her joint answer *denied* the lender's allegation that the LLC "is a religious corporation" — surrendering the Religious Corporations Law § 12 defense that a mortgage of religious-corporation property requires judicial approval — and in the 2023 bankruptcy petition she signed as purported "sole member," she designated the LLC "Single Asset Real Estate" and left the "Tax-exempt entity" box unchecked, with no mention of temple, worship, or religion anywhere. The congregation's sanctuary was, on her paper, her real estate. Yet whenever she spoke of what she actually administered, she conceded a temple: her own opposition papers filed in this Court describe her late husband as "the spiritual leader of the Church" and "the late pastor of the Congregation," and describe her role after his death as an attempt "to carry on his legacy and preserve the Church" [Bankr. ECF 38 ¶¶ 3, 27]; her own August 16, 2023 turnover letter itemizes her custody of "the Mandir's bank account," "the Mandir credit card account," "keys to the Mandir," six bins of murti clothes (deity garments), funds for ritual ghee, and the temple's receipt books written in her hand [Bankr. ECF 38-16]; and when the congregation's beneficial ownership of the Property was squarely presented in the 2024 intervention proceedings, the state court recited that "no opposition [was] submitted by the defendants, SHREE RADHA KRISHNA, LLC and NADIRA SHARMA" [NYSCEF 110, Index No. 704078/2022]. At no time — under her stewardship or at any other — did the Property house any tenant, occupant, or use other than the Temple itself and its prayers, pujas, and rituals. In August 2023 the devotees elected a new Executive Committee, removed her, and began reconstructing the finances. The companion proceedings before this Court — the removed action, now referred to this Court by Order of Hon. Ramón E. Reyes, Jr. dated July 16, 2026 (E.D.N.Y. No. 1:26-cv-00729, ECF 10), and the Debtor's adversary proceeding for substantive consolidation and constructive trust — seek to conform record title to the Temple's equitable ownership.

**B. The City Has Always Known This Is a Temple**

13. The City's own assessment roll classifies the Property as Building Class "M9 — Miscellaneous Religious Facility." That classification appears on every Notice of Property Value DOF has issued for years, alongside the words "Your property tax exemptions: None." The City has thus simultaneously recorded that the building is a religious facility and taxed it as a commercial one.

14. The City has also dealt with the Temple and the LLC as one operation. In February 2025, DOF's Lien Enforcement Unit addressed its 90-Day Lien Sale Warning — demanding $226,259.58 by May 19, 2025 on pain of a May 20, 2025 lien sale — to the LLC. It was the Temple that answered: with its Executive Committee's authorization, the Temple applied for a DOF payment agreement in its own corporate name and under its own EIN 06-1516938, paid $40,000 down from congregational donations, and DOF accepted the application, took the money, and issued Installment Agreement No. 152611 on July 9, 2025. The City billed the shell and contracted with the church — for the same building's taxes.

**C. The 2021 Revaluation: 236% in One Year, 87% of It Unexplained**

15. The Department of Finance values Class 4 property by an income-capitalization methodology: it estimates the property's income-producing capacity — principally from the Real Property Income and Expense (RPIE) statements that owners of income-producing property must file, or, where none exists, from income *imputed* from purportedly comparable properties — capitalizes that estimate into a market value, assesses at 45% of market value, and phases increases into the taxable assessment over five years through the transitional assessment mechanism. The method presupposes a commercial premise: that the building exists to produce income. Applied to a house of worship that produces none, every step of the method manufactures a fiction.

16. Through tax year 2020-21 the fiction remained modest: DOF estimated the Property's market value at $465,000 (2019-20) and $479,000 (2020-21), on a recorded building of 4,900 square feet, wholly non-residential, Grade C, carried on DOF's books as built in 1925. Then, by Notice of Property Value dated January 15, 2021 — mailed not to the temple at 126-04 133rd Avenue, South Ozone Park, whose congregation would have seen it, but to Nadira Sharma's own home at 105-48 132nd Street, South Richmond Hill, a different address in a different neighborhood (rendered "10548 132nd St." on DOF's mailing label) — DOF repriced the Property at $1,610,000 for 2021-22: an increase of $1,131,000, or 236%, in a single year.

17. The January 2021 notice explains, on its face, only a fraction of that leap. It discloses a "Structural Change to Your Property" — the box checked is "Alteration" — and states: "The Department of Finance included an increase of $150,000 for this structural change when we estimated your market value." The alteration was the congregation's post-fire reconstruction, completed and reopened in May 2017, which DOF booked nearly four years late. The remaining

$981,000 — 87% of the increase — is attributed by the notice to nothing except DOF's formula: "the change in year over year value per square foot of similar properties." In one year, without any appraisal of this Property, without any income data for this Property (no RPIE ever having been filed, the Property having no commercial income to report), and without identifying a single comparable, DOF nearly tripled the imputed value per square foot of a Hindu temple — from roughly $98 to $272.

18. The same notice quietly rewrote the building itself. Gross square footage grew from 4,900 to 5,920; a 1,960-square-foot "residential" component appeared on a property the very same notice codes "Units: 1 Non-Residential"; and the errors DOF itself invited the owner to correct — including "Year Built: 1925" for a building substantially reconstructed in 2014–2017, and a "Grade C" classification — were carried forward unexamined. The notice fixed a deadline of March 1, 2021 to challenge the assessed value before the Tax Commission, April 1, 2021 to request review of the market value, and invited a "Request to Update" to correct the description. Every one of those rights expired unused in the mailbox of the defaulting fiduciary; the congregation saw nothing.

19. The 2021 repricing then compounded automatically. DOF ratcheted the market value to $1,755,000 (2022-23), $1,861,000 (2023-24), $1,899,000 (2024-25), $1,927,000 (2025-26), and $1,975,000 (2026-27) — the last carrying an assessed value of $888,750 and DOF's own estimated tax of $91,940.05 per year (taxable value $847,530 at the 10.848% Class 4 rate). As the transitional assessment phased the 2021 leap into the taxable value year by year, the annual levy climbed from approximately $20,000 (2020-21) to approximately $46,000 (2021-22) to approximately $92,000 (2026-27) — a quadrupling and more of the tax on a donation-funded sanctuary, all descending from a single unexplained, unchallenged, mass-appraisal repricing.

20. No protest, market-value review, request to update, or exemption application was ever filed in response to any of these notices; every deadline passed silently at the address of the estate's adversary, whose misconduct is the subject of the estate's claims. The congregation knew nothing until the lien-sale machinery reached its door.

**D. The Arrears, the Penalties, and the Claim**

21. Tax payments ceased in mid-2021 — the same period Mrs. Sharma's mortgage payments ceased while her donation collections continued. The arrears have since compounded at

Class 4 rates of up to eighteen percent per annum, augmented by RPIE non-filing penalties (including a $3,000 penalty charged January 1, 2026) — penalties for failing to report the income of a business that does not exist. In December 2021 and thereafter, congregational money was applied to arrears under lien-sale pressure; in 2025 the Temple paid $40,000.00 more (tendered June 2, 2025; credited July 9, 2025) and entered the installment agreement described above, which has since fallen into default as the Temple conserved resources for this reorganization.

22. On January 29, 2026, DOF filed Claim No. 1 in the Debtor's chapter 11 case asserting a secured claim of $368,711.13 for real property taxes and related charges. The claim is materially composed of (a) taxes assessed on the arbitrary revaluation described above, (b) taxes that would never have been assessed at all had the exemption to which the Property's ownership and use entitled it been in place, and (c) interest and penalties compounding both.

## COUNT I DETERMINATION UNDER 11 U.S.C. §§ 505 AND 502(b)(1) THAT THE DOF CLAIM IS UNENFORCEABLE TO THE EXTENT OF THE MANDATORY RELIGIOUS EXEMPTION (RPTL § 420-a; N.Y. Const. art. XVI, § 1)

> "[The] exclusion . . . from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution . . . and cannot stand." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017).

23. Plaintiff repeats each foregoing allegation.

24. RPTL § 420-a(1)(a) provides that real property owned by a corporation organized exclusively for religious purposes and used exclusively for such purposes "shall be exempt from taxation." The exemption is mandatory, and it is constitutionally entrenched: exemptions of property used exclusively for religious purposes "may be altered or repealed" only as to future grants — never destroyed as to qualifying property. N.Y. Const. art. XVI, § 1. New York's highest court has described the doctrine as "[f]irmly embedded in the law of the state, both by Constitution . . . and by statute . . . that real property owned by a religious corporation and used exclusively for religious purposes is exempt from taxation." *Walz v. Tax Comm'n*, 24 N.Y.2d 30, 246 N.E.2d 517, 518 (1969) (per curiam), *aff'd*, 397 U.S. 664 (1970). The lineage is as old as the State: New York has exempted religious property from colonial times, codified the exemption in the Law of May 27, 1896, ch. 908, § 4, and entrenched it constitutionally in 1938. Nor is the exemption conditioned on paperwork: "there is no requirement that an application be filed to obtain an RPTL 420-a

exemption." *Matter of Eternal Flame of Hope Ministries, Inc. v. King*, 76 A.D.3d 775, 776–77 (3d Dep't 2010), *lv. denied* 15 N.Y.3d 715 (2010). The absence of an application by anyone in the years at issue thus explains only how the error reached the roll — it does not make the tax lawful. The governing test is threefold: the entity must be organized exclusively for an enumerated purpose; the property must be used primarily in furtherance of that purpose; and no pecuniary profit may inure beyond reasonable compensation. *Matter of Legion of Christ v. Town of Mount Pleasant*, 1 N.Y.3d 406, 411 (2004). The first and third elements are beyond dispute here — the Temple is a federally recognized church (EIN 06-1516938) whose officers serve as unpaid volunteers — and the second is conceded by the City's own roll.

25. The exclusive-use element has never been in doubt: the City's own roll classifies the Property "M9 — Miscellaneous Religious Facility," and the building has been in exclusive, continuous religious use since 1999 (rebuilt 2014–2017). Nor is there any non-religious use to weigh: the second floor is used for the congregation's own religious observances — Hindu weddings, pujas, festivals, and the life-cycle ceremonies of devotee families — solemnized with voluntary offerings that sustain the sanctuary; it has never been let for secular or commercial purposes. The governing test is physical reality: "[i]t is the actual or physical use of the property" that determines exemption. *Matter of Lackawanna Community Dev. Corp. v. Krakowski*, 12 N.Y.3d 578, 581 (2009). So much so that churches *closed* by their diocese — suppressed by canonical decree, used only for monthly prayers and the storage of religious artifacts while actively marketed for sale — remain exempt where religious use is their only actual use: "the mere fact that this use is now less frequent does not alter the properties' tax-exempt status." *Matter of St. William's Church of Troy, N.Y. v. Dimitriadis*, 115 A.D.3d 1031, 1033 (3d Dep't 2014); *accord Matter of Mary Immaculate School of Eagle Park v. Wilson*, 73 A.D.2d 969, 970 (2d Dep't 1980); *Greater N.Y. Corp. of Seventh-Day Adventists v. Town of Dover*, 29 A.D.2d 861 (2d Dep't 1968); cf. *Hosanna-Tabor*, 565 U.S. at 193–94 (religious character "is not one that can be resolved by a stopwatch"). New York, moreover, construes "exclusively" to mean "principal" or "primary," and exemption statutes must not be read "so narrow[ly] and literal[ly] as to defeat [their] settled purpose." *Association of the Bar v. Lewisohn*, 34 N.Y.2d 143, 153 (1974); *accord People ex rel. Mizpah Lodge v. Burke*, 228 N.Y. 245 (1920); *New York Catholic Protectory v. City of New York*, 175 Misc. 427, 428 (Sup. Ct. 1940) (strict construction "should not be slavishly followed" where it would frustrate the exemption's purpose); *Watchtower Bible & Tract Soc'y v. Lewisohn*, 35

N.Y.2d 92 (1974) (what an organization actually does — not labels — determines religious character). And RPTL § 420-a(2) preserves the exemption for portions of exempt property whose incidental revenues are applied to the maintenance and support of the exempt purpose. If occasional worship in a shuttered church sustains the exemption, daily worship in a living temple compels it — a fortiori and beyond rational dispute.

26. The ownership element is satisfied by the Temple's equitable and beneficial ownership. New York law recognizes that equitable ownership by an exempt organization — possession, control, payment of carrying costs, and the right to a conveyance — satisfies RPTL § 420-a; legal title is not talismanic. At all relevant times the Temple has been the equitable owner of the Property: its congregation paid for the Property in 1999, rebuilt it after the fire, paid its mortgages and carrying charges with donated funds, possessed and used it exclusively, and the LLC has held bare record title as constructive trustee — a status to be confirmed by judgment in the companion proceedings, whose determinations Plaintiff incorporates by reference and pleads here in the alternative.

27. Section 502(b)(1) of the Bankruptcy Code disallows a claim to the extent it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." Section 505(a)(1) empowers this Court to "determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax," whether or not previously contested, subject to the limitations of § 505(a)(2).

28. To the extent the Property was owned in equity by the Temple and used exclusively for religious purposes during any period covered by Claim No. 1, the taxes for that period were assessed on mandatorily exempt property, are not legally owing, and the claim is unenforceable against the estate's interest in the Property to that extent. Plaintiff seeks that determination for each period open to determination under § 505(a), and disallowance of the claim under § 502(b)(1) to the same extent. Nor does the relief sought raise any Establishment Clause difficulty: the concern that exemptions confined to religion alone may operate as forbidden subsidy, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), has no purchase here, because RPTL § 420-a is precisely the broad, neutral, secular-and-religious class — religious, charitable, hospital, educational, and moral-improvement uses alike — that *Walz* approved. The Temple asks only for the treatment every other member of the mandatory class already receives.

## COUNT II DISALLOWANCE, REDUCTION, OR SUBORDINATION OF INTEREST AND PENALTIES (11 U.S.C. §§ 502(b), 505(a), 510(c); RPTL; N.Y.C. ADMIN. CODE)

> Enforcement of tax penalties against a bankrupt estate "would serve not to punish the delinquent taxpayers, but rather their entirely innocent creditors." *Simonson v. Granquist*, 369 U.S. 38, 40–41 (1962).

29. Plaintiff repeats each foregoing allegation.

30. Claim No. 1 includes (a) interest compounded at rates of up to eighteen percent per annum, and (b) penalties — including RPIE non-filing penalties — imposed for failing to file commercial income-and-expense statements for a house of worship that has no commercial income, in years when every notice was mailed to the home of the estate's adversary and the congregation had no knowledge of the obligations asserted.

31. The Court should determine under § 505(a)(1) the legality of each penalty and each interest component; disallow or reduce them to the extent not legally owing, excessive, or attributable to periods when the Property was exempt (Count I); and, in the alternative, equitably subordinate the penalty components under § 510(c), penalties being no compensation for pecuniary loss and their enforcement against a house of worship's sanctuary being inequitable on these facts. From and after the Petition Date, any interest allowable on any secured portion is governed by 11 U.S.C. §§ 506(b) and 511.

## COUNT III DECLARATORY JUDGMENT: PROSPECTIVE EXEMPTION UPON VESTING OF RECORD TITLE (28 U.S.C. § 2201; RPTL § 420-a)

> "[T]here is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970).

32. Plaintiff repeats each foregoing allegation.

33. The Debtor's confirmed plan will vest the estate's interests in the Property in the reorganized Debtor and, upon judgment in the companion adversary proceeding, record legal title as well. An actual controversy exists as to the Property's exemption thereafter: DOF's notices state "exemptions: None," and DOF continues to bill at the commercial rate.

34. Plaintiff seeks a declaration that, upon record title vesting in the Temple, the Property qualifies for the RPTL § 420-a exemption as of the next taxable status date for which

application is made; that DOF must accept and process the Temple's exemption application; and that no transfer, recording, or stamp tax applies to the vesting conveyance, 11 U.S.C. § 1146(a).

## COUNT IV REDETERMINATION OF THE 2021 REVALUATION AND SUBSEQUENT ASSESSMENTS FOR ALL PERIODS OPEN UNDER APPLICABLE LAW (11 U.S.C. § 505(a))

> The Constitution requires "the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster Cnty.*, 488 U.S. 336, 343 (1989).

35. Plaintiff repeats each foregoing allegation.

36. The January 2021 revaluation increased the Property's asserted market value 236% in a single year; the City's own notice attributed only $150,000 of the $1,131,000 increase to any physical change; the balance derived from a mass-appraisal model applied without a single year of actual income data (no RPIE having ever been filed, the Property producing no commercial income), against scarce comparables for a purpose-built religious facility in a residential zone, upon a property description containing patent errors. The resulting assessments are excessive, erroneous, and arbitrary. And when a taxing authority seeks to subject to taxation property devoted to religious use, New York places the burden on the municipality: "a municipality seeking to withdraw an existing exemption bears the burden of proving that the real property in question has become subject to taxation." *St. William's Church of Troy*, 115 A.D.3d at 1032; *Matter of Lackawanna Community Dev. Corp. v. Krakowski*, 12 N.Y.3d 578, 581 (2009); *Matter of New York Botanical Garden v. Assessors of Town of Washington*, 55 N.Y.2d 328, 334 (1982). Here the City's own roll has at all times acknowledged the religious character it now taxes.

37. For each tax period for which the time to contest or redetermine had not expired under applicable nonbankruptcy law as of the relevant date — including the current period and each future period — the Court should determine the Property's lawful assessed valuation under § 505(a)(1), and reduce the corresponding components of Claim No. 1 and any postpetition accruals accordingly. Plaintiff further reserves its state-law protest and certiorari remedies (RPTL art. 7; N.Y.C. Tax Commission) for all open periods — proceedings that are "in the nature of a trial de novo," unconfined by the assessor's record. *Eternal Flame of Hope Ministries*, 76 A.D.3d at 777.

## COUNT V RLUIPA — SUBSTANTIAL BURDEN, 42 U.S.C. § 2000cc(a) (AS APPLIED TO THE CITY'S LAND-USE REGULATION OF THE TEMPLE)

> RLUIPA "provides expansive protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

38. Plaintiff repeats each foregoing allegation.

39. The City implements a system of land use regulations — its Zoning Resolution, building classification, certificate-of-occupancy, and change-of-use requirements — under which it has individualized assessment procedures for the permitted use of property. Houses of worship are community-facility uses permitted as of right in the Property's R3-2 district.

40. As applied to the Property, the City's administration of that system has left a building the City itself classifies as a religious facility without a certificate of occupancy conforming to its three-decade religious use; carried it under a housing-code classification as a dwelling; recorded contradictory descriptions of its use and dimensions across agencies; and thereby exposed the congregation's sanctuary to the compounding burdens described above — commercial taxation premised on the misclassification, penalties for commercial filings never owed, and lien-sale enforcement — while the Temple bears the cost, delay, and uncertainty of inspections, professional retention, and re-permitting to conform the City's paper to the City's own acknowledged reality.

41. As applied, the City's implementation of its land use regulations imposes a substantial burden on the Temple's religious exercise — including by threatening the very availability of the sanctuary for worship — without a compelling governmental interest pursued by the least restrictive means. 42 U.S.C. § 2000cc(a)(1), (2)(C). Plaintiff seeks declaratory and injunctive relief requiring the City to process the Temple's legalization and change-of-use applications expeditiously and without discriminatory or extortionate conditions, and such damages as are available, with attorneys' fees under 42 U.S.C. § 1988.

## COUNT VI RLUIPA — EQUAL TERMS AND NONDISCRIMINATION, 42 U.S.C. § 2000cc(b)

> "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

42. Plaintiff repeats each foregoing allegation.

43. On information and belief, the City treats similarly situated nonreligious assembly and institutional uses — clubs, lodges, community facilities — on terms more favorable than it has treated the Temple in the administration of its land-use classifications and legalization processes as applied to the Property. To the extent discovery confirms such treatment, the City's implementation of its land use regulations treats this religious assembly on less than equal terms and discriminates against it, in violation of 42 U.S.C. § 2000cc(b)(1)–(2).

## COUNT VII 42 U.S.C. § 1983 — FIRST AND FOURTEENTH AMENDMENTS, AS APPLIED (FREE EXERCISE; ESTABLISHMENT CLAUSE ENTANGLEMENT; WALZ)

> "State power is no more to be used so as to handicap religions than it is to favor them." *Everson v. Board of Education*, 330 U.S. 1, 18 (1947).

44. Plaintiff repeats each foregoing allegation.

45. In *Walz v. Tax Commission*, 397 U.S. 664 (1970), the Supreme Court sustained New York's religious property tax exemption precisely because exemption "restricts the fiscal relationship between church and state" and spares both "the direct confrontations and conflicts that follow in the train of those legal processes" — tax valuation of religious premises, liens, and foreclosures — recognizing that the power to tax a house of worship "involves the power to destroy." New York embraced that benevolent neutrality in its Constitution and statutes — as has every one of the fifty States and the federal government, an "unbroken" national practice the *Walz* Court found stretching back two centuries. 397 U.S. at 676–78. Nor did the City come to that principle as a bystander: *Walz* arose from the New York City Tax Commission's exemption of religious property, and it was the City that successfully defended the exemption of devotional property against constitutional attack in every court up to and including the Supreme Court. The exemption, in short, has never been mere fiscal grace: from the founding era it has been understood as a structural reinforcement of the First Amendment itself — the fiscal expression of free exercise — which is why its administration against a house of worship carries constitutional stakes that the taxation of ordinary commercial property does not.

46. *Walz* did not write on a blank slate. From the founding, the American answer has been that religion in its devotional character lies beyond the taxing jurisdiction of civil government: in Madison's words — written against a Virginia religious assessment and carried into the First Amendment he drafted — "religion is not within the cognizance of Civil

Government." The Supreme Court has enforced that boundary against the taxing power specifically: the First Amendment "operates as a specific constitutional limitation upon the exercise" of the power to tax, *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); a tax may not be exacted as the price of religious exercise, *Follett v. Town of McCormick*, 321 U.S. 573 (1944), whose concurrence warned that the taxing power is "a dangerous and potent weapon which, in the hands of unscrupulous or bigoted men, could be used to suppress freedoms and destroy religion"; and the general principle is older still — "an unlimited power to tax involves, necessarily, a power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 327 (1819). The church-autonomy cases guard the same boundary from the other side. *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). Nor is the exemption fairly described as a subsidy at all: as the leading scholarship of the *Walz* era demonstrated, the religious exemption is best understood as a definition of the tax base itself — houses of worship stand outside the class of wealth the sovereign has chosen to tax — and the State's declining to tax reflects the *independence* of church from state, where a grant would create dependence. Boris I. Bittker, *Churches, Taxes and the Constitution*, 78 Yale L.J. 1285 (1969).

47. The constitutional tradition distinguishes a church's *commercial* ventures — which the State may tax like any other — from its *devotional* property, which it may not destroy by taxation. The City's error here inverts that line perfectly: it has taken a building that produces no commercial income, that its own roll designates a religious facility, and taxed it *as if it were a commercial venture* — imputing business income to a sanctuary, demanding the filings of a business, penalizing their absence, and pursuing the collection remedies *Walz* itemized as the very forms of entanglement exemption exists to prevent: "tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes." 397 U.S. at 674. History supplies the cautionary template: a sovereign that first *revalues* religious property, then encumbers it, then forecloses upon it, has been the classic instrument of religious dispossession since the Dissolution of the Monasteries — valuation, then confiscation. The Religion Clauses were adopted by a generation that knew that history; the City's as-applied course — a 236% revaluation of a sanctuary, an eighteen-percent compounding of the result, a lien-sale warning, and a proof of claim against the temple in bankruptcy — walks the same road. The Supreme Court's boundary cases prove the rule: a State may impose neutral taxes

on a ministry's *commercial sales*, *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990) — but this Property has no commerce to tax; only the sanctuary itself.

48. Nor is the State's hand free merely because a benefit rather than a penalty is at stake. Three times in six years the Supreme Court has held that when government establishes a generally available benefit, it may not administer that benefit to the exclusion of the faithful: *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464 (2020) ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."); *Carson v. Makin*, 596 U.S. 767 (2022). New York was not obliged to entrench a religious property exemption in its Constitution — but having done so, the City cannot administer the benefit so that an actual, functioning, City-acknowledged house of worship is the one class member that never receives it, on the strength of paper formalities engineered and then abandoned by the faithless fiduciary the congregation has had to sue. The unconstitutional-conditions principle does not tolerate benefit schemes administered to defeat the very class the benefit exists to protect.

49. As applied here, the City has administered its tax and land-use apparatus in the manner *Walz* warned against: it has recorded the Property as a religious facility while valuing it as a commercial venture on imputed commercial income; demanded of a sanctuary the income disclosures of a business and penalized their absence; compounded the exactions at eighteen percent; and prosecuted the result toward the lien sale and foreclosure of a house of worship — the maximal church-state confrontation. This as-applied course of conduct, undertaken pursuant to municipal policy and custom, burdens the Temple's free exercise of religion and fosters precisely the excessive entanglement the Religion Clauses forbid, and it deprives the Temple of rights secured by the First Amendment, as incorporated by the Fourteenth, in violation of 42 U.S.C. § 1983.

50. Plaintiff seeks declaratory relief, injunctive relief against enforcement of the challenged exactions pending exemption processing, nominal and compensatory damages as available, and attorneys' fees under 42 U.S.C. § 1988. Plaintiff pleads in the alternative the corresponding protections of the New York Constitution, art. I, § 3 and art. XVI, § 1.

## COUNT VIII REFUND (11 U.S.C. § 505(a)(2)(B))

> When a State exacts a tax unlawfully, due process requires that it provide "meaningful backward-looking relief" — "a clear and certain remedy." *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 31, 39 (1990).

51. Plaintiff repeats each foregoing allegation.

52. The Temple paid, from congregational funds, $40,000.00 credited July 9, 2025 (tendered June 2, 2025), and further sums before and since, on account of taxes, interest, and penalties assessed against the Property. To the extent such sums exceeded what was lawfully owing (Counts I, II, and IV), the estate is entitled to a refund. The Debtor has made, or contemporaneously herewith makes, proper demand for such refund upon DOF; upon the earlier of determination or the lapse of 120 days, this Court may determine the refund's amount and order its turnover. 11 U.S.C. §§ 505(a)(2)(B), 542.

53. Independently, the estate is entitled to *credit and equitable recoupment* against Claim No. 1. By filing its proof of claim, DOF submitted its tax account with the Property to this Court's allowance process; the estate may defensively assert, against that claim, all overpayments arising from the same account and course of dealing — including the $40,000.00 paid in 2025 (tendered June 2, 2025; credited July 9, 2025, with Installment Agreement No. 152611), the December 2021 payments made under lien-sale pressure, and every other sum paid on account of taxes, interest, or penalties that Counts I, II, and IV establish were not lawfully owing. "[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely." *Bull v. United States*, 295 U.S. 247, 262 (1935). Whatever limitations might govern a freestanding refund suit, they do not bar the estate's defensive credit against the City's own claim. 11 U.S.C. §§ 502(b), 505(a), 553, 558.

54. Accordingly, the Temple seeks: first, a credit against any Allowed amount of Claim No. 1 (and any postpetition tax accruals) in the full amount of all past payments attributable to periods and charges determined not to have been lawfully owing; and second, to the extent such payments exceed the Allowed claim, a refund of the excess with interest, upon compliance with § 505(a)(2)(B).

## COUNT IX EQUAL PROTECTION — U.S. CONST. AMEND. XIV; N.Y. CONST. ART. I, § 11; 42 U.S.C. § 1983

> "[T]he intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 446 (1923).

55. Plaintiff repeats each foregoing allegation.

56. The Property belongs to a class the City itself defines: Building Class M9, miscellaneous religious facilities. On information and belief, the overwhelming majority of properties in that class — buildings identical to the Property in use, character, and income-producing capacity (none) — are wholly exempt from taxation and bear no levy at all, while the Property has been assessed on imputed commercial income at values escalating 236% in a single year and taxed toward lien sale and foreclosure.

57. That disparity — full commercial taxation of one house of worship while similarly situated houses of worship in the same class lawfully bear nothing — lacks a rational basis in anything but the paper formality of a defunct titleholder, works an intentional and systematic inequality in tax treatment of similarly situated property, and denies the Temple the equal protection of the laws — for under New York law it is what an organization and its property actually are and do, not the label on the deed, that determines religious character, *Watchtower Bible & Tract Soc'y v. Lewisohn*, 35 N.Y.2d 92 (1974); *Matter of St. William's Church of Troy, N.Y. v. Dimitriadis*, 115 A.D.3d 1031 (3d Dep't 2014) ("actual or physical use" controls, quoting *Lackawanna*, 12 N.Y.3d at 581). U.S. Const. amend. XIV; N.Y. Const. art. I, § 11; *Sioux City Bridge*, supra; *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989).

58. Plaintiff seeks a declaration of the violation, corresponding reduction and disallowance of Claim No. 1, injunctive relief conforming the Property's treatment to that of its class, damages as available, and attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment:

(a) On Count I, determining that Claim No. 1 is unenforceable and disallowing it to the extent the Property was mandatorily exempt under RPTL § 420-a and N.Y. Const. art. XVI, § 1;

(b) On Count II, disallowing, reducing, or subordinating the interest and penalty components of Claim No. 1, and fixing postpetition interest, if any, under 11 U.S.C. §§ 506(b) and 511;

(c) On Count III, declaring the Property exempt under RPTL § 420-a upon vesting of record title in the Temple and application therefor, and directing DOF to accept and process the application; and declaring the vesting conveyance exempt from transfer taxes under 11 U.S.C. § 1146(a);

(d) On Count IV, redetermining the Property's assessed valuation for all periods open under applicable law and reducing the claim and postpetition accruals accordingly;

(e) On Counts V and VI, declaring the City's as-applied implementation of its land use regulations violative of RLUIPA, enjoining the City to process the Temple's legalization, change-of-use, and certificate-of-occupancy applications promptly and on equal terms, and awarding damages and attorneys' fees under 42 U.S.C. § 1988;

(f) On Count VII, declaring the City's as-applied conduct violative of the First and Fourteenth Amendments and 42 U.S.C. § 1983 and of N.Y. Const. art. I, § 3 and art. XVI, § 1, with corresponding injunctive relief, damages, and fees;

(g) On Count VIII, granting the estate credit and equitable recoupment against any Allowed amount of Claim No. 1 (and postpetition accruals) for all past payments of taxes, interest, and penalties not lawfully owing, and ordering a refund, with interest, of all amounts in excess of lawful liability;

(h) On Count IX, declaring that the taxation of the Property, in departure from the treatment of similarly situated religious facilities in the City's own M9 class, denies equal protection, with corresponding disallowance, injunctive relief, damages, and fees;

(i) Enjoining, pursuant to 11 U.S.C. §§ 105(a) and 362, any lien sale, in rem foreclosure, or transfer of any tax lien on the Property during the pendency of the chapter 11 case; and

(j) Granting such other and further relief as is just.

Dated: New York, New York
July 22, 2026

Respectfully submitted,

**Counsel for Plaintiff-Debtor Shri Radha Krishna Mandir Inc.**

/s/ *Karamvir Dahiya*
Karamvir Dahiya, Esq.

Dahiya Law Offices LLC
111 John Street, Suite 1860
New York, New York 10038
(212) 766-8000 | karam@dahiya.law